# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

(1) TAYLOR BURKE, as Special Administrator to the Estate of LAWANDA WARD, deceased,

    Plaintiff,

v.

(1) CITY OF TULSA, OKLAHOMA
(2) G4S SECURE SOLUTIONS (USA), INC.
(3) Christa Kaler
(4) Sarah Kessler
(5) Baleigh Napier
(6) Moises Izquierdo Santos
(7) Matthew Willis
(8) J. Besson
(9) M. Forbes
(10) B. Frederick
(11) E. Okoduwa
(12) S. Whitworth

    Defendants.

Case No. 21-cv-00131-JED-CDL

JURY TRIAL DEMANDED

ATTORNEY LIEN CLAIMED

## COMPLAINT

**COMES NOW**, Plaintiff Taylor Burke ("Plaintiff"), as the Special Administrator of the Estate of Lawanda Ward ("Ms. Ward" or "Lawanda"), deceased, and for his causes of action against the above-named Defendants, alleges and states the following:

## PARTIES, JURISDICTION AND VENUE

1. Taylor Burke is a citizen of the State of Oklahoma and the duly-appointed Special Administrator of the Estate of Lawanda Ward. The survival causes of action in this matter are based on violations of Lawanda's rights under the Fourteenth Amendment to the United States Constitution.

1

2.    Defendant City of Tulsa, Oklahoma ("City" or "Defendant City of Tulsa") is a municipality located in Tulsa County, Oklahoma. The City provides and employs the Tulsa Police Department.

3.    Defendant G4S Secure Solutions (USA), Inc. ("G4S" or "Defendant G4S") is a national corporation headquartered in Jupiter, Florida. Defendant G4S staffs the Tulsa Municipal Jail.

4.    Defendant Christa Kaler ("Kaler" or "Defendant Kaler") is a Tulsa Municipal Jail Detention Officer, employed by Defendant G4S. Officer Kaler committed underlying violations of Lawanda's constitutional rights, explained below in more detail.

5.    Defendant Sarah Kessler ("Kessler" or "Defendant Kessler") is a Tulsa Municipal Jail Detention Officer, employed by Defendant G4S. Officer Kessler committed underlying violations of Lawanda's constitutional rights, explained below in more detail.

6.    Defendant Baleigh Napier ("Napier" or "Defendant Napier") is a Tulsa Municipal Jail Detention Officer, employed by Defendant G4S. Officer Napier committed underlying violations of Lawanda's constitutional rights, explained below in more detail.

7.    Defendant Moises Izquierdo Santos ("Izquierdo" or "Defendant Izquierdo") is a Tulsa Municipal Jail Detention Officer, employed by Defendant G4S. Officer Izquierdo Santos committed underlying violations of Lawanda's constitutional rights, explained below in more detail.

8.    Defendant Matthew Willis ("Willis" or "Defendant Willis") is a Tulsa Municipal Jail Detention Officer, employed by Defendant G4S. Officer Willis committed underlying violations of Lawanda's constitutional rights, explained below in more detail.

9.    Defendant J. Besson ("Besson" or "Defendant Besson") is a Tulsa Municipal Jail Detention Officer, employed by Defendant G4S. Officer Benson committed underlying violations of Lawanda's constitutional rights, explained below in more detail.

10. Defendant M. Forbes ("Forbes" or "Defendant Forbes") is a Sergeant in the Tulsa Police Department, employed by Defendant City of Tulsa. Sergeant Forbes committed underlying violations of Lawanda's constitutional rights, explained below in more detail.

11. Defendant B. Frederick ("Frederick" or "Defendant Frederick") is a Tulsa Municipal Jail Detention Officer, employed by Defendant G4S. Officer Frederick committed underlying violations of Lawanda's constitutional rights, explained below in more detail.

12. Defendant E. Okoduwa ("Okoduwa" or "Defendant Okoduwa") is a Tulsa Municipal Jail Detention Officer, employed by Defendant G4S. Officer Okoduwa committed underlying violations of Lawanda's constitutional rights, explained below in more detail.

13. Defendant S. Whitworth ("Whitworth" or "Defendant Whitworth") is a Tulsa Municipal Jail Detention Officer, employed by Defendant G4S. Officer Whitworth committed underlying violations of Lawanda's constitutional rights, explained below in more detail.

14. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

15. The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

16. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, since the claims form part of the same case or controversy arising under the United States Constitution and federal law.

17. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

**STATEMENT OF FACTS**

18. Paragraphs 1-17 are incorporated herein by reference.

19. On or about January 2, 2020, at approximately 6:30 p.m., Ms. Lawanda Ward was brought to the Tulsa Municipal Jail as a pre-trial detainee.

20. At this time Defendant Frederick assisted Lawanda in completing a medical questionnaire. While she was completing it, the arresting officer informed Defendants Frederick and Okoduwa that Ms. Ward had apparently swallowed narcotics approximately two hours before her arrival at the Jail and that Ms. Ward was "making every possible attempt not to come to jail."

21. The arresting officer informed Defendant Izquierdo that EMSA had checked Ms. Ward at the scene of her arrest and indicated that her vital signs were normal *at the time of her arrest*.

22. Ms. Ward informed Defendant Okoduwa she could barely walk or stand up straight, and that she wasn't feeling well and requested an assessment by a medical professional. However, there was no medical professional available at the Jail.

23. On her medical questionnaire, Ms. Ward indicated that she suffered from high blood pressure and lupus, and that she was taking prescription medication for high blood pressure and depression at the time of her booking.

24. At approximately 8:00 a.m. on January 3, 2020, Defendant Besson was "sitting at [their] post in control" when Lawanda continuously pushed the intercom button. According to Besson, they could hear Lawanda repeatedly yelling "help" from her cell. Through the intercom, Besson asked Lawanda what she needed, but she continued to yell for help and sit in front of her cell door. "After a while," according to Besson, she stopped, went to her bunk, and fell asleep. No further action was taken by Defendant Besson.

25. Also at approximately 8:00 a.m. on January 3, 2020, Defendant Kaler started her shift and was notified of Ms. Ward's presence at the Jail. Sometime that morning, Kaler "called court

4

records and spoke with Lauren Baker to see if courts would add [Lawanda] onto the court docket *due to her medical needs*." Lauren Baker apparently called back later and spoke to Defendant Besson, stating the judge determined that Ms. Ward "would have to wait until her court date due to her charges." Lawanda spent approximately 72 more hours detained in the Jail without proper medical attention before she succumbed to her ailments.

26. Sometime on the morning of January 4, 2020, Defendant Whitworth assisted Ms. Ward in using the telephone to call her sister. Whitworth told Lawanda to tell her sister to bring Lawanda's prescription medication to the Jail. After speaking to her sister, Lawanda informed Whitworth that her sister could not bring the medication to the Jail *and that the detention officers should take her to the hospital instead*. Whitworth replied by telling Ward "her family just needed to step up and bring her medications." At this time Ward tried to make another phone call but could not reach anyone. Whitworth then wheeled Ward back to her cell. During this time, Ward told Whitworth that she was a diabetic and had not taken her insulin in three (3) days. Whitworth explained to Ward that the Jail staff had no insulin to give her and that *no medical staff was present at the facility*. Whitworth again asked Ward why her family would not bring her medications to the Jail. Ward replied that they "just wanted [Jail staff] to send her to the hospital."

27. On January 4, 2020, Defendant Forbes witnessed Ms. Ward exclaiming that "she couldn't breathe" as she attempted to use the telephone.

28. Additionally on January 4, 2020, Defendant Kessler reported that Ward would exclaim how she "couldn't breathe" repeatedly to Kessler and Defendants Forbes and Whitworth. However, Kessler stated that Ward "did not appear to struggle to breath [sic] in any way."

29. Also on January 4, 2020, Defendant Napier witnessed Lawanda attempting to get the attention of EMSA paramedics, who were in the female ward of the Jail for another inmate, by screaming "Help! Help! EMSA, help me!" Defendant Napier's supervisor, Defendant Forbes,

instructed Napier to take Ward back to her cell. Napier complied with this order and ignored the pleas of Ms. Ward.

30. During his shifts from January 4, 2020 through January 6, 2020, Defendant Willis reported multiple instances of Ms. Ward asking for officers' attention, staring blankly after being asked a question, acting erratically in her cell, and refusing to eat. Not once did Willis attempt to inquire about Lawanda's medical state aside from asking "if she was okay," to which she would not respond.

31. On January 6, 2020, at approximately 8:30 a.m., Lawanda was found unresponsive in her cell. She was not breathing and did not have a detectable heartbeat. After several attempts to revive her using CPR and an AED device, she was transported to a hospital where she was later pronounced dead.

32. An autopsy report by the Office of the Oklahoma Chief Medical Examiner (OCME) concluded the cause of her death was heart disease and cocaine toxicity, with pneumonia and chronic obstructive pulmonary disease also contributing.

33. During her stay at the Jail, Ms. Ward exhibited numerous symptoms in concert with the causes of death confirmed by the OCME:

   a. According to the Mayo Clinic, symptoms of COPD include, but are not limited to: shortness of breath, chest tightness, lack of energy, and swelling in ankles, feet, and legs.[1]

   b. According to the Mayo Clinic, symptoms of heart disease include, but are not limited to: chest pain, chest tightness, chest pressure and chest discomfort, shortness of breath, pain, numbness, and weakness or coldness in legs or arms.[2]

---

[1] https://www.mayoclinic.org/diseases-conditions/copd/symptoms-causes/syc-20353679
[2] https://www.mayoclinic.org/diseases-conditions/heart-disease/symptoms-causes/syc-20353118

      c.  The Mayo Clinic also notes that the symptoms of pneumonia include, but are not limited to: chest pains when breathing, confusion or changes in mental awareness, and shortness of breath.[3]

      d.  According to the American Addiction Centers, symptoms of cocaine toxicity include: elevated heart rate, pain in the chest, panicked feelings, delirium, and paranoia, among others.[4]

34. As multiple members of the Jail staff reported, Ms. Ward complained about difficulty breathing and feeling discomfort; displayed wildly erratic behavior such as yelling and screaming profanities for no apparent reason, appearing unresponsive and/or confused when spoken to, refusing to eat, and staring at one spot for hours; and at many moments pinched and touched her legs, ankles, and feet most likely due to swelling caused by her ailments. Additionally, multiple Jail staff members knew Ms. Ward was prescribed medications for serious medical conditions, and she even relayed her family's request that she be taken to a hospital, to no avail. The closest action Jail staff took to addressing the medical needs of Ms. Ward was to ask her if she was okay, to which she would normally not even reply. Further, Jail staff regularly ignored Ms. Ward's specific insistences regarding her difficulty breathing due to no reason other than Ms. Ward's ostensible ability to speak.

35. Upon information and belief, Ms. Ward was *never* treated, seen, or evaluated by a medical professional during her time at the Jail.

36. It is clear Jail staff were deliberately indifferent to Ms. Ward's pleas for help, overall behavior, and clear medical conditions. This wanton disregard for Lawanda's wellbeing is evidenced by certain reports and episodes including: intake officers being told that Ms. Ward was

---

[3] https://www.mayoclinic.org/diseases-conditions/pneumonia/symptoms-causes/syc-20354204
[4] https://americanaddictioncenters.org/cocaine-treatment/overdose-symptoms-and-dangers

7

"making every possible attempt not to come to jail"; taking Ms. Ward back to her cell when she tried to get the attention and help of EMSA paramedics; noting condescendingly in incident reports that Ms. Ward used a wheelchair but that she was observed going to the bathroom on her own; and detention officers telling each other that Ms. Ward was "cookoo" and "with every new face of detention staff she sees, [Ms. Ward] complains of another or different ailment." It is abundantly clear that Jail staff disregarded recklessly Ms. Ward's conditions while she was incarcerated, and attributed her behavior to simple attempts to either get attention and/or seek removal from the Jail. Most unfortunately, these reckless assumptions led to Lawanda's suffering and death.

37. The Jail failed to comply with the essential standards for receiving screening of the National Commission on Correctional Health Care (NCCHC). According to the NCCHC, "[s]creening is performed on all inmates upon arrival at the intake facility to ensure that emergent and urgent health needs are met." However, upon information and belief, the only medical evaluation of Ms. Ward conducted on her arrival at the Jail was her completion of the questionnaire, which was subsequently disregarded in the face of her pleas for medical assistance and other related behaviors.

38. According in NCCHC guidance:

> Reception personnel need to ensure that people who are unconscious, semiconscious, bleeding, **mentally unstable, severely intoxicated, exhibiting symptoms of alcohol or drug withdrawal, or otherwise urgently in need of medical attention are referred immediately for care and a medical clearance into the facility**. This documented clinical assessment of medical, dental and/or mental status **may come from on-site qualified health care professionals or may require sending the individual to the hospital emergency room**…[t]he receiving screening is a process of structured inquiry and observation **intended to identify potential emergency situations among new arrivals and to ensure that patients with known illnesses and those on medications are identified for further assessment and continued treatment**. In jails and juvenile facilities, **the screening may be conducted by health-trained correctional personnel or qualified health care professionals**…[a]dministrators should consider the risks of not knowing an inmate's medical condition (e.g., suicidal ideation, prescription medications,

8

> communicable illness symptoms, drug and alcohol use and/or withdrawal symptoms) when designing the intake and receiving screening process…**[s]taff need to get an idea of inmates' urgent health needs, identify and meet any known or easily identifiable needs that require medical intervention**, and identify and isolate inmates who may be contagious. **All immediate health needs identified through the screening process should be properly addressed by qualified health care professionals**. When inmates indicate they are under treatment for a medical, dental, mental health or substance use problem, **health staff should initiate a request for a health summary from the community prescribers after obtaining a signed release from the patient**.

(Emphasis added). *See* https://www.ncchc.org/filebin/CorrectCare/33-2.pdf.

39. Upon information and belief, including incident reports from Jail staff, Lawanda received a level of attention and care nowhere near those stated in the NCCHC guidelines. In an alarming example, upon receiving information from the arresting officer that Ms. Ward had swallowed narcotics two hours prior to her booking, the Jail failed to perform a toxicology report or otherwise address this urgent condition.

40. Defendant G4S is responsible for staffing the Tulsa Municipal Jail. Defendants Kaler, Kessler, Napier, Izquierdo Santos, Willis, Besson, Frederick, Okoduwa, and Whitworth were employed by G4S to oversee inmates at the Jail. As previously admitted by the employees, there was no medical staff present whatsoever to detect, respond, or otherwise oversee the health and wellbeing of those incarcerated. As the staffing agency and employer of the Jail staff, G4S had a duty not only to ensure inmates were properly cared for, but for employees to be adequately prepared to deal with issues pertaining to inmate safety and health as they arose.

41. Defendant City of Tulsa, as the employer and provider of the Tulsa Police Department, is responsible for managing the Tulsa Municipal Jail. Pursuant to this duty, a TPD Sergeant is a member of the Jail staff. At the time of Ms. Ward's incarceration, that was Defendant Forbes. As the managing entity of the Jail, the City has a duty to provide for the health and wellbeing of its

inmates. Notably, the City provided no on-site medical staff at the Jail, and, upon information and belief, did not require G4S to employ any medical staff. Moreover, upon information and belief, the City did not provide training or guidance to G4S or its on-site Sergeant (Defendant Forbes) regarding inmate health screenings, toxicology assessments, medical episodes, prescription drug needs, and/or other health-related concerns that would reasonably arise in the operation of a municipal jail.

## CAUSES OF ACTION

### I.

### VIOLATION OF THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
### (42 U.S.C. § 1983)

**A.    Jail Staff/Underlying Violations**

42.    Paragraphs 1-41 are incorporated herein by reference.

43.    The Jail Staff, Defendants Kaler, Kessler, Napier, Izquierdo Santos, Willis, Besson, Frederick, Okoduwa, Whitworth, and Forbes (in his role as the on-site TPD Sergeant), described above, knew — or it was objectively obvious — there was a strong likelihood that Lawanda was in danger of serious harm.

44.    As described *supra*, Lawanda had serious and emergent medical issues that were known and/or obvious to the Jail staff, including Defendants Kaler, Kessler, Napier, Izquierdo Santos, Willis, Besson, Frederick, Okoduwa, Whitworth, and Forbes. It was obvious that Lawanda needed immediate and emergent evaluation and treatment from a physician, but such services were denied, delayed and obstructed. Indeed, Ms. Ward was left to languish at the facility for almost four (4) days, despite her obvious and serious medical needs. Tellingly, Jail staff even attempted to get her case expedited due to their knowledge of her medical needs, but a judge denied this request. This attempt was clearly made not out of concern for Lawanda's safety, but rather Jail staff's refusal

to attend to the needs of Ms. Ward and their desire to absolve themselves of responsibility over her. It is clear, therefore, that Jail staff, including Defendants Kaler, Kessler, Napier, Izquierdo Santos, Willis, Besson, Frederick, Okoduwa, Whitworth, and Forbes, disregarded the known, obvious and substantial risks to Lawanda Ward's health and safety.

45.     Under the circumstances, Jail staff, including Defendants Kaler, Kessler, Napier, Izquierdo Santos, Willis, Besson, Frederick, Okoduwa, Whitworth, and Forbes, had a duty and obligation to assure that Lawanda received treatment or access to medical personnel capable of evaluating the need for treatment. They did neither, in deliberate indifference to Lawanda's serious medical needs.

46.     Jail staff, including Defendants Kaler, Kessler, Napier, Izquierdo Santos, Willis, Besson, Frederick, Okoduwa, Whitworth, and Forbes, were also deliberately indifferent under a purely objective standard of liability. That is, Jail staff, including Defendants Kaler, Kessler, Napier, Izquierdo Santos, Willis, Besson, Frederick, Okoduwa, Whitworth, and Forbes, did not take reasonable available measures to abate the obvious risk of substantial harm to Lawanda.

47.     As a direct and proximate result of this deliberate indifference, as described above, Ms. Ward experienced unnecessary physical pain, a worsening of her condition, severe emotional distress, mental anguish, lost wages, a loss of quality and enjoyment of life, terror, degradation, oppression, humiliation, embarrassment, and death.

48.     As direct and proximate result of Defendants' conduct, Plaintiff is entitled to pecuniary and compensatory damages. Plaintiff is entitled to damages due to the deprivation of Lawanda's rights secured by the U.S. Constitution, including punitive damages.

**B.     Municipal Liability (City of Tulsa)**

49.     Paragraphs 1-48 are incorporated herein by reference.

50. There is an affirmative link between the deprivation of Lawanda's constitutional rights and TPD policies, practices and/or customs which the City of Tulsa promulgated, created, implemented and/or possessed responsibility for.

51. On information and belief, TPD/the City of Tulsa has utterly failed to train and supervise TPD officers with respect to recognizing the signs and symptoms of serious medical conditions, especially COPD, heart disease, cocaine toxicity, and pneumonia, from harm.

52. On information and belief, TPD/the City of Tulsa has utterly failed to train and supervise TPD officers with how to protect arrestees with serious medical conditions, especially COPD, heart disease, cocaine toxicity, and pneumonia, from harm.

53. TPD/the City of Tulsa should have known that this failure to train and supervise was substantially certain to result in Constitutional violations.

54. The failure to train and supervise provided by Defendant City of Tulsa resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendant City of Tulsa and were also moving forces behind the violation of Lawanda's civil rights and the resulting injuries alleged herein.

55. As a direct result of TPD's/the City's unlawful conduct, Lawanda suffered serious actual physical and emotional injuries, death, and other damages and losses as described herein entitling Plaintiff to compensatory and special damages, in amounts to be determined at trial.

**C.  G4S Secure Solutions (USA), Inc.**

56. Paragraphs 1-55 are incorporated herein by reference.

57. There is an affirmative link between the deprivation of Lawanda's constitutional rights and G4S policies, practices and/or customs which G4S promulgated, created, implemented and/or possessed responsibility for.

58. On information and belief, G4S has utterly failed to train and supervise detention officers with respect to recognizing the signs and symptoms of serious medical conditions, especially COPD, heart disease, cocaine toxicity, and pneumonia, from harm.

59. On information and belief, G4S has utterly failed to train and supervise detention officers with how to protect detainees with serious medical conditions, especially COPD, heart disease, cocaine toxicity, and pneumonia, from harm.

60. G4S should have known that this failure to train and supervise was substantially certain to result in Constitutional violations.

61. The failure to train and supervise provided by Defendant G4S resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendant G4S and were also moving forces behind the violation of Lawanda's civil rights and the resulting injuries alleged herein.

62. As a direct result of G4S's unlawful conduct, Lawanda suffered serious actual physical and emotional injuries, death, and other damages and losses as described herein entitling Plaintiff to compensatory and special damages, in amounts to be determined at trial.

## II.

## NEGLIGENCE
## (G4S)

63. Paragraphs 1-62 are incorporated herein by reference.

64. G4S owes a duty to arrestees/detainees, including Ms. Ward, to use reasonable care to assure those arrestees/detainees in need of medical attention, like Lawanda, are provided with appropriate and timely medical attention.

65. G4S breached that duty by wholly failing to assure that Lawanda received prompt and adequate medical treatment of her obvious medical needs.

66. As a direct and proximate cause of G4S's negligence, Lawanda experienced physical pain, severe emotional distress, mental anguish, and the damages alleged herein.

67. At all pertinent times, G4S was acting within the scope of their duty as operators of the Tulsa Municipal Jail.

68. G4S is vicariously liable for the negligence of its employees and agents, acting within the scope of their employment, including Defendants Kaler, Kessler, Napier, Izquierdo Santos, Willis, Besson, Frederick, Okoduwa, Whitworth, and Forbes.

69. As a direct and proximate cause of the negligence alleged herein, Ms. Ward suffered real and actual damages, mental and physical pain and suffering, emotional distress, lost wages and other damages in excess of $75,000.00.

**WHEREFORE**, based on the foregoing, Plaintiff prays this Court grant the relief sought, including but not limited to actual and compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

**SMOLEN & ROYTMAN**

/s/Daniel E. Smolen
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
701 S. Cincinnati Avenue
Tulsa, Oklahoma 74119
(918) 585-2667 P
(918) 585-2669 F
danielsmolen@ssrok.com
bobblakemore@ssrok.com

***Attorneys for Plaintiff***